**Kyle K. VESS et al., Plaintiff,**

**v.**

**David M. GARDNER, Defendant-Third Party Plaintiff-Appellee,**

**v.**

**McCOY FLYING SERVICE, INC., Third Party Defendant-Appellant.**

**No. 26883.**

United States Court of Appeals Fifth Circuit.

July 16, 1969.

Thomas H. Watkins, Jackson, Miss., David Cottrell, Jr., Gulfport, Miss., Eaton Cottrell, Galloway & Lang, Gulfport, Miss., Watkins & Eager, Jackson, Miss., for appellant.

Sanford R. Steckler, Clyde Hurlbert, Biloxi, Miss., Boyce Holleman, Norman L. Breland, Holleman & Necaise, Gulfport, Miss., Hurlbert & O'Barr, Biloxi, Miss., for appellee.

Before WISDOM and DYER, Circuit Judges, and KRENTZMAN, District Judge.

DYER, Circuit Judge:

In this diversity action Flying Service appeals from a judgment entered upon a jury verdict finding it liable to Gardner for injuries sustained by him resulting from the negligent operation of a DC–3 aircraft owned by Aeronaut Air Service but piloted by an employee of Flying Service. The issue of the pilot's apparent authority to use the DC–3 aircraft on a charter flight for Gardner was resolved by the jury against Flying Service. We affirm.

Flying Service operated an air taxi business out of the office and hangar which it occupied at the Gulfport Municipal Airport, Gulfport, Mississippi. It was licensed by the Federal Aviation Administration to fly planes weighing less than 12,500 pounds. It owned several small single-engine planes which were basically pleasure craft and leased a twin-engine Beechcraft which was used primarily in its air taxi business. Flying Service was a corporation wholly owned by Dr. McCoy and managed by his daughter.

Dr. McCoy and Vess owned a partnership known as Aeronaut Air Service.[1] Aeronaut had been in the leasing and chartering business in the same area served by Flying Service. Aeronaut's office was located adjacent to Flying Service's property. While Flying Service and Aeronaut had separate telephone numbers, their telephones had been connected by use of an interoffice intercom. The sole reason for maintenance of the semblance of two independent business entities was Dr. McCoy's desire to take full tax advantage of the rapid depreciation allowable on airplanes. Aeronaut owned a twin-engine Beechcraft which it leased to Flying Service and a DC–3 which it parked on Flying Service's property. The DC–3 weighed more than 12,500 pounds and under F.A.A. regulations was not available to Flying Service for use in its air taxi business. In early September of 1965 Aeronaut ceased doing business in Mississippi. After that time, however,

---

1. At one time Vess also owned 49% of Flying Service. Apparently Vess did not approve of Dr. McCoy's decision to hire his daughter to manage the air taxi business. Vess sold his interest.

it continued to lease the Beechcraft to Flying Service and continued to park the DC-3, which it was trying to sell, on Flying Service's property.

Gardner is an entertainer who frequently appears in the Southern States. His travel arrangements were always made by his wife. Using the number listed in the telephone book for Flying Service, she had on several occasions arranged for Flying Service to transport Gardner and his family to various Southern cities from Gulfport. On one such occasion, August 31, 1965, she made arrangements with Flying Service to fly Gardner to New Orleans, Louisiana. As usual Flying Service provided the pilot and the plane. The plane was the DC-3, which was owned by Aeronaut and parked on Flying Service's property.

On June 26, 1966, Gardner's wife called Flying Service and made arrangements for a charter flight to New Orleans, Louisiana. Gardner and his party arrived at the airport and boarded the Beechcraft. The pilot, Doering, was unable to start the engines of the Beechcraft, and Gardner inquired if any other planes were available. The pilot replied that the DC-3 was fueled and ready to fly. Gardner and his family, the Gulfport police chief and his family, and several other persons boarded the DC-3. After an inadequate pre-flight inspection the DC-3 took off.[2] The pilot soon discovered that the landing gear would not retract. Instead of returning to the airport the pilot elected to proceed to New Orleans. An oil leak developed in one of the engines, both of which had been rapidly overheating. The leaking engine had to be feathered. The resulting loss of power together with the extra drag exerted by the inoperative landing gear caused the plane to lose altitude until it crashed into a wooded area. The pilot and one passenger were killed. Gardner, his wife and daughter sustained serious injuries.

Dr. McCoy and Vess, doing business as Aeronaut Air Service, sued Gardner for damages alleging the conversion and destruction of the DC-3. Gardner counter-claimed for personal injuries and sued Flying Service as a third party defendant. The jury returned a verdict for Gardner on the plaintiff's complaint and the counter-claim was dismissed. The jury returned a verdict for Gardner on the third-party complaint and assessed his damages at $80,000. Judgment was entered on the verdict and Flying Service appealed.

■ Flying Service contends that the pilot of the ill-fated DC-3 was not its employee because the pilot was paid by the trip instead of by the week. This gives us little pause because the pay period or time of employment is of no legal significance, nor is the fact that the pilot worked for others during the same period that he worked for Flying Service. It is undisputed that Flying Service employed Doering to fly the Gardner charter.

■ Flying Service's alternative argument that the pilot had no authority to fly the DC-3 is equally without merit. The determinative issue is whether there was sufficient evidence vel non from which the jury could reasonably conclude that Flying Service knowingly permitted the pilot to use the DC-3, or held him out as possessing the authority to use it. We agree with Flying Service that statements of the employee do not constitute a legal basis upon which apparent authority can be established. The statements or actions must be those of the employer to legally clothe the employee with apparent authority. Steen v. Andrews, 1955, 223 Miss. 694, 78 So. 2d 881; Tarver v. J. W. Sanders Cotton Mill, Inc., 1939, 187 Miss. 111, 192 So. 17; Birdsong v. W. C. Craig & Co., 1916, 111 Miss. 708, 72 So. 136. Here the pilot never left Flying Service's part of the airport. He got out of the Beech-

---

2. The DC-3 had not been used in three months. Part of the pre-flight procedure was handled by a young boy who was not a pilot. The oil was not checked and probably contained sludge after three months of inactivity.

craft, which would not crank, and went into Flying Service's office. He emerged from the office and proceeded to the DC–3, which was parked on Flying Service's property. There was evidence that the key to the door of the plane was kept in the office of Flying Service. The DC–3 was not locked and no one indicated that it was not to be flown.

Flying Service advertised its charter service in the telephone book. A prospective customer, dialing the indicated number, could have been connected to either Flying Service or Aeronaut as the phones of their respective offices were connected. Gardner's wife had always made arrangements with Flying Service and had never heard of Aeronaut until after the accident. On August 31, 1965, and June 26, 1966, Flying Service provided Gardner with the DC–3, pilot and co-pilot. Dr. McCoy was attempting to sell the DC–3 and several of the pilots had spoken to Gardner about the possibility of buying it.

Flying Service's argument that Gardner was on some kind of notice because Aeronaut's name was written on the charge tickets for both of the DC–3 flights is unpersuasive because all arrangements for the two flights were made through Flying Service and the charge tickets were signed in Flying Service's office. Neither Gardner nor his wife ever saw the charge tickets after the day of the flight because all of Gardner's expenses were paid by Gardner's accountants.

Flying Service urges that the pilot could not have had authority to fly the DC–3 because Flying Service was not authorized by the F.A.A. to fly planes weighing over 12,500 pounds. But this begs two questions: Did the pilot know that F.A.A. prohibited such flights? Did Gardner know that the DC–3 was not authorized for charter flights? The record is silent concerning the pilot's knowledge of the F.A.A. restriction. Manifestly, Gardner was led to believe by both Flying Service and the pilot that the DC–3 was airworthy in all respects. When Gardner boarded the DC–3 on June 26, 1966, he immediately recognized it to be the plane which had previously flown him to New Orleans. Perhaps the flight limitation on the DC–3 might be shown to controvert the pilot's actual authority to operate that aircraft, but the limitation was irrelevant to the pilot's apparent authority to do so.

■■ Considering all of the evidence with all reasonable inferences most favorable to Gardner, we have no doubt that a jury could have reasonably concluded that Flying Service clothed the pilot with apparent authority to fly the DC–3, and for the determination of this issue it was properly "the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365.

■ Turning now briefly to the other points raised by Flying Service, it urges reversal because the District Judge permitted an inquiry by third party plaintiff of third party defendant's witness concerning the reputation for truth and veracity of a previous witness who had testified for the third party plaintiff. The grounds stated for the objection were unintelligible and insufficient. In any event the error, if any, was so inconsequential as to be harmless.

■ Error is asserted in the District Court's instructions to the jury because there was insufficient evidence to support charges on actual or apparent authority and on loss of future earnings of the plaintiff. We find that there was ample evidentiary basis for the instructions and that they were properly submitted under Mississippi law. Birdsong v. W. C. Craig & Co., *supra.*

■ Flying Service finally insists that the amount of the verdict is excessive because Gardner made more money in the year of the crash than he had made in the previous year. But this is not the sole yardstick for assessing damages. Gardner had many sources of income. After the crash he con-

tinued to receive royalties from records he had previously made, but there is no doubt that Gardner was seriously injured in the crash and his resulting disability required him to cancel business engagements. We find that the verdict was not excessive and is supported by the weight of the evidence.

Affirmed.